**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:25-CR-00167 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | **MOTION TO SUPPRESS** |
| | ) | |
| STANLEY BARROW, | ) | |
| | ) | |
| Defendant. | ) | **HEARING REQUESTED** |
| | ) | |

Now comes the Defendant, Stanley Barrow, by and through undersigned counsel, and moves this Honorable Court to suppress the evidence derived from the search conducted on August 24, 2024.

This motion is premised on the legal argument set forth in the accompanying memorandum, to be supplemented by additional argument and evidence as required.

An evidentiary hearing is requested.

Respectfully submitted,

*/s/ Marisa T. Darden*
Marisa T. Darden (0098583)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
127 Public Square Suite 4900
Cleveland, OH 44114-1304
mdarden@beneschlaw.com
Telephone: 216.363.4440
*One of the Attorneys for*
*Defendant Stanley Barrow*

## MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

### SUMMARY OF ARGUMENT

Courts have a longstanding history of permitting police to conduct a protective sweep for officer safety. Even so, this routine practice is not without limitation. Recognizing the need to balance officer safety and the protections afforded by the Fourth Amendment, courts permit a limited search of the areas immediately adjacent to where a defendant is located. A critical distinction exists when officers seek to exceed that boundary. To expand the scope of the search, the Supreme Court established an unequivocal rule: there must be reasonable, articulable suspicion that an individual posing a threat to officer safety is harbored in the area to be swept. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The rule makes sense – when law enforcement seeks to encroach upon a constitutionally protected area, it must be justifiable.

The Supreme Court's bright-line is there for a reason. An individual's right to privacy in their home is a fundamental right afforded to every citizen. If every time law enforcement enters a home to render aid or make an arrest, they have free reign to sweep the entire premises without justification, this effectively negates the individual's Fourth Amendment protections. To prevent such an outcome, the Supreme Court has made clear that law enforcement's ability to conduct a protective sweep does not automatically arise. Rather, law enforcement must have (1) a reasonable suspicion of danger from inside the home, and (2) an articulable basis to support that belief. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Here, law enforcement had neither.

In this case, law enforcement knew, prior to entering the home, that Mr. Barrow was located on the second floor and in need of emergency aid. Upon entry, Officers Dickerson and Thompson went directly upstairs where they encountered four bedrooms. They searched the three immediately adjacent bedrooms for potential threats and then turned to where Mr. Barrow was located to render aid. Shortly after, two additional officers on scene, Officer Rost and

2

Officer Santana, entered the home and the following exchange ensued with Officer Dickerson, one of the responding officers who was located on the second floor:

OFFICER DICKERSON:     I don't see any weapons, so just bring EMS in when they get here.

OFFICER SANTANA:     Just checking the rest of the house.

OFFICER SANTANA:     Hey [Officer Rost] there's a basement I'm just going to go down there and check it.

**(Exhibit A, Body Camera Footage of Officer Santana, 8:32–8:46.)** That Officers Santana and Rost then swept the basement was wholly improper. By the time Officers Rost and Santana entered the home, the upstairs bedrooms immediately adjacent to where police knew Mr. Barrow to be had already been swept.  Further, Officer Dickerson verified that no weapons were found, directed EMS to enter the home, evidencing Officer Dickerson's belief that it was safe for unarmed medical personnel to enter the home.  Officer Dickerson made no mention that other individuals were suspected of being in the home; nor had there been any indication of additional individuals in the home in the nearly ten minutes that police had already been on scene. There was no basis for a protective sweep of the basement located two floors below where the incident was occurring. Thus, the search violated the Fourth Amendment, and any evidence derived therefrom must be suppressed.

## BACKGROUND

On August 24, 2024, at approximately 7:10 am, Cleveland Police responded to the area of West 89th Street and Platten Avenue in Cleveland, Ohio for what amounted to a mental health crisis. Officers Dickerson and Rost were dispatched in connection with a "trouble unknown" call, where a male was reportedly seen hanging from the second-floor window. When police arrived, they met the 911 caller around the corner from the scene. The caller reported that he observed a broken second-story window, with a male mumbling inside and throwing items out

3

the window. Officers Dickerson and Rost then proceeded to the back alley of the housing complex where they observed Mr. Barrow and the broken second story window with blood on the frame. Officers Dickerson and Rost briefly observed Mr. Barrow in the window, but despite numerous attempts, they were unable to communicate with him. Shortly thereafter, Officers Thompson and Santana also arrived on scene. After a failed attempt to open the back door, Officers Dickerson and Thompson proceeded to the front of the home to locate another point of entry while Officers Rost and Santana remained in the back alley. After approximately two minutes, Officers Dickerson and Thompson forcibly entered through the front door. Prior to entry, officers were on scene for approximately ten minutes and did not observe anything to suggest that others might have been inside or on premises.

Upon entry, Officers Dickerson and Thompson immediately went to the second floor. As they reached the second floor, where they knew Mr. Barrow to be, the officers checked the other immediately adjacent rooms for threats and found none. Mr. Barrow was located and exhibited behaviors consistent with a mental health crisis. He was alone, covered in blood with cuts on his arms, naked, and disoriented. Mr. Barrow made several references that he "was sleeping," and at no point was combative with the officers.

After Officers Dickerson and Thompson cleared the second floor and secured Mr. Barrow – a process that lasted just under two minutes – Officers Santana and Rost, who were waiting outside, entered the home. From upstairs, Officer Dickerson radioed down that no weapons were found and that EMS could enter. Based only on this information – that Mr. Barrow was secured upstairs and that it was safe for medical personnel to enter, Officers Santana and Rost proceeded to check the first floor. Notably, despite there being a closed closet door just steps into the first room of the house, neither Officer Rost nor Officer Santana checked it for a

threat. Instead, they sped past the first (and only) place where an immediate threat to officer safety could have been lurking.

Officer Santana proceeded directly through the first floor of the residence – through the front room (living room), an empty dining room space, and into the kitchen, where he noticed an open basement door in the far corner of the basement. He turned back to Officer Rost, informed him of the basement and said he was "just going to go down there and check it." **(Exhibit A, Body Camera Footage of Officer Santana, 8:42–8:45.)** In response, Officer Rost said, "yep, let's take a look." (*Id.*). This entire sequence lasted approximately sixteen (16) seconds.

At this point, officers had been on scene for approximately ten minutes. They knew that one person was located in a second-story bedroom suffering from a mental health crisis. Officers Dickerson and Thompson, the first to enter, had confirmed that the second-floor bedrooms – those immediately adjacent to Mr. Barrow – were clear and secure. Likewise, Officer Dickerson conveyed that no firearms had been located, and that it was safe for unarmed medical personnel to enter the home. Without so much as searching a closed closet door in the first floor living room, and despite having no additional information to suggest others were in the house, Officers Santana and Rost proceeded down the basement steps. In the basement, they found a powdery substance that Officer Santana originally described as "sand." **(Exhibit A, Body Camera Footage of Officer Santana, 9:02–9:06.)** Likewise, Officer Rost noted he did not know what the powdery substance was, but speculated that it could be "a lot of things." **(Exhibit A, Body Camera Footage of Officer Santana, 9:23–9:28.)** It was not until both officers returned upstairs that Officer Santana finally opened the closet door right inside the front room.

The sweep conducted by Officers Santana and Rost was unlawful, as they lacked articulable facts to believe that the basement harbored an individual posing a danger.

5

Nevertheless, after returning upstairs, Officers Rost and Santana directed Officers Dickerson and Thompson to the basement.  When a fifth officer, Sergeant Vargas, arrived shortly after the initial home entry, Officer Rost likewise directed him to the basement. At some point during the subsequent entries, an officer took photographs of the contraband that was discovered during the unlawful search.[1]

Detective Detrick later responded to the scene where he and others again entered the basement.  Detective Detrick explained that photographs were taken.  Detective Detrick then left the scene to prepare a search warrant package.  The photographs taken during one of many subsequent trips to the basement, coupled with the facts obtained during the unlawful search of the basement by Officers Santana and Rost, were incorporated into Detective Detrick's search warrant application and affidavit.  The search warrant was authorized by Judge John Sutula of the Cuyahoga County Court of Common Pleas.  Officers executed the warrant at approximately 11:27 pm, more than four hours after police initially responded.  Officers then conducted a full search of the house and discovered additional evidence, including a firearm. The powdery substances in the basement was later determined to be cocaine and fentanyl.

ARGUMENT

**A.      The Government Will Not Sustain Its Burden.**

The Fourth Amendment safeguards individuals against unreasonable governmental searches and seizures, with the home recognized as the "first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). To encroach upon these protections, the government must obtain a warrant supported by probable cause. *Carpenter v. United States*, 585 U.S. 296, 304 (2018). While there are exceptions to the warrant requirement, they are "few in number and carefully delineated[.]"

---

[1] Based on the body camera footage provided to defense counsel, it is unclear which officer took the photographs that were ultimately incorporated into the search warrant application.

*United States v. Archibald*, 589 F.3d 239, 294 (2009). Here, the warrant exception set forth in the United States Supreme Court's decision in *Maryland v. Buie* governs.

> We [] hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Maryland v. Buie*, 494 U.S. 325, 334 (1990).

Courts have strictly interpreted the "spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *See generally*, *United States v. Akrawi*, 920 F.2d 418, 420 (6th Cir. 1990) (holding that the search was unlawful because "[t]he searching officers articulated no specific basis for believing that the second floor of the [] residence harbored any individual posing a threat to the agents.").

Additionally, courts frequently extend this protective sweep doctrine to warrantless entries made for the purpose of rendering emergency aid. *See, e.g.*, *Grise v. Allen*, 714 Fed. Appx. 489, 498 (6th Cir. 2017). Regardless of the reason behind the warrantless entry, courts carefully scrutinize the subsequent protective sweep. Without more, a general need for officer safety cannot justify a broad protective sweep. There must be reasonable, articulable suspicion that a threat to officer safety exists such that a protective sweep is necessary to dispel any potential threats. *Buie*, 494 U.S. at 334. The delicate balance between the need for officer safety and the protections afforded by the Fourth Amendment is well established:

> We recognize that police officers have an incredibly difficult and dangerous task and are placed in life threatening situations on a regular basis. It would perhaps reduce the danger inherent in the job if we allowed the police to do whatever they felt necessary, whenever they needed to do it, in whatever manner required, in every situation in which they must act. However, there is a Fourth Amendment to the Constitution which necessarily forecloses this possibility. As long as it is in

existence, police must carry out their often dangerous duties according to certain prescribed procedures, one of which has been transgressed here.

*United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996).

Therefore, this Court's inquiry is singularly focused – did law enforcement have a reasonable, articulable suspicion to justify a protective sweep of the entire home, and particularly the basement? For the reasons set forth below, the answer is no.

### B.      The Protective Sweep of the Entire Home Was Not Justified.

#### 1.      No Reasonable Articulable Suspicion Existed to Justify Law Enforcement's Sweep of the Basement.

"'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place." *Colbert*, 76 F.3d at 778. Said another way, law enforcement cannot rely on mere speculation or a hunch. To hold otherwise "threatens to swallow the general rule requiring that police obtain a warrant as completely as does focusing on the dangerousness of the arrestee." *Id.*

The exchange between Officer Dickerson and Officer Santana clearly establishes that a protective sweep was not justified. As mentioned above, prior to entering the home, the officers only knew that Mr. Barrow was located on the second floor, and had no evidence to suggest other people were in the home. More importantly, at the time they entered the residence, Officers Santana and Rost knew that no weapons were found and that EMS were expressly permitted to enter. That was the extent of their knowledge.  As they entered the residence and stood in the first room, neither officers' body camera footage indicates that they heard noise coming from the basement or had any other reason to believe that the basement "harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. The absence of any indication of a threat unequivocally cannot give rise to a reasonable, articulable suspicion that another individual was in the home that either posed a danger to officer safety or needed emergency aid.

8

Here, there were no facts to suggest that another individual was in the home. Rather, Mr. Barrow was alone and experiencing a mental health crisis.

Despite this, Officers Santana and Rost proceeded to sweep the first floor of the house. When Officer Santana noticed there was a basement tucked in the far corner of the first floor, he stated he was "just going to go down there and check it." **(Exhibit A, Body Camera Footage of Officer Santana, 8:42–8:45.)**  Officer Santana made no mention of believing an individual was in the basement.  He simply decided to search, without justification. During his search of the basement, he discovered what appeared to be – in his own words – "sand." **(Exhibit A, Body Camera Footage of Officer Santana, 9:02–9:06.)** Officer Rost blindly followed Officer Santana to the basement, equipped with equally non-existent facts to justify a sweep.  While in the basement, Officer Rost noted he did not know what the powdery substance was, but speculated that it could be "a lot of things." **(Exhibit A, Body Camera Footage of Officer Santana, 9:23–9:28.)** Both officers then proceeded back upstairs where EMS administered treatment to Mr. Barrow.

The decision to sweep the basement was not based on articulable facts. Rather, it was based on what courts have expressly prohibited – mere speculation. Without adequate justification, the officers were limited to searching only the areas immediately adjacent to Mr. Barrow, as Officers Dickerson and Thompson had appropriately done as they first entered the home. To go beyond those areas amounted to an unlawful search, and any evidence found therein must be suppressed as fruit of the poisonous tree. *See Wong Sun v. U.S.*, 371 U.S. 471, 487–88 (1963); *United States v. Waide*, 60 F.4th 327, 343 (2023).

9

**2. The Subsequent Entries of the Basement Were Similarly Unlawful.**

After the initial unlawful sweep of the basement, each subsequent entry was purely investigatory. Even a proper protective sweep – which this was not – cannot last any "longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335. Further, because neither Officers Rost nor Santana immediately recognized contraband in the basement, each additional entry to the basement was itself a constitutional violation.

Here, after the purported protective sweep, three additional officers entered the basement. First, Officers Rost and Santana directed Officers Dickerson and Thompson to look in the basement.  Officers Dickerson and Thompson then proceeded to the basement. Shortly thereafter, when a fifth officer, Sergeant Vargas, responded to the scene, Officer Rost immediately directed him to the basement. Again, at this point, there was no reason to believe there was a threat to officer safety as the room had been cleared. More importantly, Mr. Barrow had already been secured and taken outside with EMS.

Even if the initial entry of the basement was lawful, which it was not, these subsequent entries far exceeded the scope of a protective sweep. There was no justification to repeatedly enter the basement. Rather, the only reason was for additional officers to observe what Officer Santana originally described as "sand." Without a warrant, this conduct was in direct violation of Mr. Barrow's Fourth Amendment protections.

**C.      The Search Warrant Affidavit Lacks Probable Cause.**

The August 24, 2024, search warrant sought court-authorized permission to search the residence for "evidence pertaining to a violation of the laws of the State of Ohio, to wit: Drug Trafficking in violation of R.C. 2925.03 and Drug Possession in violation of R.C. 2925.11."

10

**(Exhibit B, pg. 6.)**  The affidavit in support of the warrant depended almost entirely on information and photographs obtained during the unlawful search of the basement. **(*See* Exhibit B.)** When a search warrant is issued based on both lawfully and unlawfully obtained information, courts "excis[e] the illegally obtained information from the affidavit and then decid[e] whether the remaining legally obtained information sufficiently supports a finding of probable cause[.]" *United States v. Williams*, 656 Fed. Appx. 751, 753 (6th Cir. 2016). This rule is dispositive here.

Paragraphs 5 through 7 of the affidavit, and the accompanying photographs, must be excised. When stripped of any information or photographs obtained from the unlawful protective sweep and subsequent investigatory searches that far exceeded legality, the affidavit is left with only information demonstrating that law enforcement responded to and observed Mr. Barrow experiencing a mental health crisis. Specifically, all that remains is (1) police responded to a report of a male yelling and hanging out of a window, (2) upon arrival, police observed Mr. Barrow covered in blood and a broken second-floor window, and (3) a photograph of the bedroom where Mr. Barrow was found.  This is not probable cause to search the residence for anything, much less for evidence of drug trafficking.

A court is limited to the four corners of the affidavit when determining whether it establishes probable cause. *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (citing *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010)). After the unlawfully obtained material is excised, there is no factual basis upon which a neutral magistrate could find a fair probability that evidence of drug trafficking or drug possession would be found in the place to be searched. The issuance of the warrant therefore rested entirely on the evidence derived from the unlawful protective sweep. Accordingly, all evidence obtained as a result of the warrant search should be suppressed.

**CONCLUSION**

For these reasons, and those set forth in any supplemental or responsive pleading, as well as that evidence and argument presented at the hearing on this matter, this Court should conclude that law enforcement's protective sweep was unlawful and should suppress any evidence derived therefrom.

Respectfully submitted,

*/s/ Marisa T. Darden*
Marisa T. Darden (0098583)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
127 Public Square Suite 4900
Cleveland, OH 44114-1304
mdarden@beneschlaw.com
Telephone: 216.363.4440
*One of the Attorneys for*
*Defendant Stanley Barrow*

12

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 5, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Marisa T. Darden
Marisa T. Darden (0098583)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
127 Public Square Suite 4900
Cleveland, OH 44114-1304
mdarden@beneschlaw.com
Telephone: 216.363.4440
*One of the Attorneys for*
*Defendant Stanley Barrow*

13